Good morning, Your Honors. May it please the Court, my name is Jared Walker on behalf of Appellant Nicholas McMahon in the Social Security Disability Insurance Appeal. I'll try to reserve 90 seconds of my time if I may. With respect to Mr. McMahon's first issue in this case, whether his spinal impairment satisfies the presumed listing of disability 1.04a, the whether the medical evidence is where, as in this case, the medical evidence appears to satisfy that listing, the ALJ has a duty to analyze that, to actually, at step three of the sequential process, where there's medical evidence that on its face appears to satisfy each criteria, the ALJ commits reversible error when he or she just doesn't do any analysis at that step three. Well, but it seems to me that your client has some burden of proof in this area, and that the burden is that you've got to show that you meet the listing, and it seems hard for me to suggest that you meet the listing if you have ability to ambulate, and therefore because you haven't shown you didn't have an inability to ambulate, I have a tough time understanding that the ALJ would have erred. Well, Your Honor, so that's what the district court denied our step-through argument. I understand. I read very carefully what the district court said, and then I looked at the record, and I don't think there is any evidence, or I don't think that one could say that your client has shown an inability to ambulate based on the evidence. I would reference our briefs where I . . . I referenced your briefs, but what's my standard of review for this ALJ? De novo. De novo, but as to the facts that the ALJ comes up with. Well, so that's the thing. At step three, and throughout the ALJ's decision, there was no analysis of the medical evidence my client submitted, which I think goes towards satisfying his burden of proof at the step three level. But as to his burden of proof, at the very least, he did have to show atrophy associated with muscle weakness, correct, or muscle weakness. And where was the evidence of that? Because as I review the record, there was . . . the evidence was contrary to that. There was no evidence that he produced, not just of general motor loss, but of atrophy with associated muscle weakness. So that, to me, is the big question, the legal question in this case. What subpart A of this listing reads, it includes a finding of motor loss, parentheses, atrophy, there's motor loss. That's objectively found throughout the records. The question is, how do you interpret that parenthetical where atrophy is thrown in after motor loss? Motor loss is a very broad medical term that simply means the loss, total or partial, of some body part or some . . . Isn't that what the parenthetical is, is the definition? Why would you put the parenthetical in otherwise? That's, to me, I think the regulation might respectfully need to be cleaned up a bit, because atrophy is a very specific medical finding, whereas motor loss is a very broad medical finding. And certainly there's other indications, there's other ways to evidence motor loss other than atrophy. So, for instance, the inability to ambulate effectively. The medical records demonstrate that. His treating doctors repeatedly noted antalgic gait, which is a limp or some other disorder in his walking manner. It referenced trouble getting up out of a chair. It referenced guarding with ambulation or grimacing. So I think there is evidence medically that was submitted to meet my client's burden that motor loss, including inability to ambulate effectively, is there. Now, I agree with you, Your Honor, the medical evidence is not clear as to whether or not there's atrophy. But on the point of atrophy, understand this man's injury was, it occurred July 2008. A lot of these medical records are 2010, 2011. The atrophy findings, on a clinical basis, are comparing one leg, one calf circumference to the other. And so at that point, if he's lost functioning, if he's not ambulating to the same extent as he was previously, the record is, the medical records don't tell us whether the atrophy has already occurred, because we're two years down the road, or if... Are you claiming that there's bilateral impingement on the nerve, and therefore there's bilateral atrophy? I'm saying from a medical perspective that's possible. The records aren't clear. But we're not talking about possibility. We're talking about evidence. Point to the evidence of a bilateral sciatica. Well, there's left-sided... Well, left-sided, and there's no atrophy on the left side. Motor loss causes atrophy, right? It can. Yeah. It does. Now, if he doesn't have atrophy, that indicates there's no motor loss. Well, again, I mean, I... Why don't you go to your next step? I think the next question is maybe where you need to go. We've heard what you're going to say about the listing. What about Dr. Karvelas? So, Dr. Karvelas was a treating pain management doctor. I counted, I believe, 29 different medical visits. The core of his opinion was that Mr. McMahon cannot sit more than four hours in a workday. Dr. Karvelas suggests that McMahon could not walk, stand more than four hours in an eight-hour day. The reviewing physicians concluded that he could stand and walk six hours in an eight-hour day. And then the ALJ was to decide between the two. And he said, I'm not going with Karvelas or Karvelas. I don't know how you say that. I'm from Idaho. I say it wrong. But then they say, no, can't be. McMahon walked with a normal gait and his pain was alleviated with a facet and epidural steroid injections and acupuncture. And therefore, there's no way I can agree with Dr. Karvelas. So, the ALJ's treatment of Dr. Karvelas' opinion, the error there is that the ALJ addressed every component of the opinion other than sit, stand, walk limitations, which are at the core of it. But let me ask you this. It looked like the ALJ took note of the internal conflict between Dr. Karvelas' records, which reflected light duty. He was capable of light duty throughout. And the inconsistency of that with the final check-the-box form that said no more than four hours. Now, do you know what the workers' compensation standard is for light duty versus sedentary? I can't say what the standard is for light duty. What I can say is that the workers' compensation ratings speak to what a claimant or person can't do. The question for the residual functional capacity finding is what is the maximum that a patient or claimant can do. And so, they're flipped. So, a statement by Dr. Karvelas for workers' compensation purposes that this man must have limited work, modified work, light duty work, that isn't an affirmative finding that he can, in fact, sit, stand six hours a day, which would be the social security definition for light work or the standard that he would have to meet. But that's the question. Well, but the bottom line for me is, and I pointed it out as best I could, the differences as to walk and stand. And the ALJ had to give specific legitimate reasons for his rejection of what Dr. Karvelas said, or he had to take that over the reviewing physicians. And he did. He said he walked with a normal gait. His pain was alleviated with facet and epidural steroid injections and acupuncture. And therefore, he said, I'm not believing Karvelas. I'm going to go with what the reviewing physicians say. Which meets the nature of what he's got to say. So respectfully, two points. One, a reviewing, non-examining physician can't constitute substantial evidence by which to withhold. Nobody's saying that. I'm saying what he had to do is he had to give specific reasons why and legitimate reasons why he would reject the treating doctor's opinion. And he gave specific reasons to reject. And that's enough, isn't it? Not with respect to those core opinions of Dr. Karvelas relating to sit, stand, and walk. Those issues were never specifically addressed by this ALJ. And I think that's where we claim error. Thank you, Your Honors. Thank you very much. Good morning, Your Honors. Elizabeth Feer on behalf of Nancy A. Berryhill, the Acting Commissioner of Social Security. The claimant does not meet this listing 104. It's his burden to prove that he met every element of the listing. And no matter what, we don't think that that listing does require the inability to amulate effectively. But irrespective of that, he doesn't meet it. And when you're talking about motor loss, the listing absolutely requires motor loss. And we don't have that here. We have 5-5 strength almost all the time. And the only doctor who found anything less than that was Dr. Shea, who provided the facet and lumbar injections. And he found 4-plus over 5 on one muscle, which is the outside muscle in the calf, which works to flex the big toe. That's it. That's not motor weakness that reaches listing level irrespective of anything else in the record. But you also have to, because there is lumbar involvement here, the listing does absolutely require positive straight leg testing, sitting and supine. We don't have that in the record. We have some positive straight leg tests, but there's no evidence that the doctors did them in both positions. And the documentation is not what is required in the listing. The listing does require detailed documentation. That's at 1.00D, which is in the introductory section of the musculoskeletal listings. It also requires that the limitations stemming from one of these musculoskeletal conditions has to be severe enough to prevent a person from engaging in substantial gainful activity. And here we have the claimant, every, most doctors find some level of light work. You have Dr. Shea's treatment records with the injections, which are overwhelmingly positive. It's just, there are certain abnormalities in those records, but you cannot deny that they document a great improvement. Normal motor strength in the upper extremities and only that four plus in the one muscle. They also absolutely always say normal gait, and they just simply don't support a listing level limitation with this spine condition. So if you don't have any more questions about that, I could move on to the doctor's opinions. Dr. Carvalis does actually talk about, or the ALJ does talk about Dr. Carvalis's sit-stand limitations. On the top of page 22, he says, his opinion is generally supported by the fact. And he says, based on the discussion, the previous discussion, if you look at page 20, page 21 of the ALJ's decision with the original pagination, the ALJ gives detailed discussions of the record and why no doctor ever saw this claimant uncomfortable. He has normal gait. But that doesn't seem to be correct. The no doctor ever saw that this patient was uncomfortable or had difficulty sitting or standing. There's the, what is it called? Dr. Santiago. Antalgia. I mean, the idea of trouble moving from, you know, making positions while you're sitting because you're uncomfortable. There's notes of that throughout Dr. Carvalis's records. So when the ALJ says no doctor has ever seen him having any discomfort sitting or standing, it seems to me that's objectively incorrect if you look at the, if you review the doctor's records. I agree that there is some of that in there. I think the significant discomfort would be how I would characterize it. Dr. Santiago, the spinal consultant, did say that he had some problem. He had some discomfort when he got up from sitting through a long interview. And antalgia is just a limp, so it's not necessarily, and it doesn't carry throughout the entire record. You look at Dr. Carvalis, he does say some of the limping, but then Dr. Shea, who saw claimant at least as often, if not more, every single time said normal gait. So that doesn't weigh against the ALJ's rejection of Dr. Carvalis. And then you have the two state agency experts who look at the record. Dr. Bullard was very late in the process in August of 2012. And both of those doctors talked about Dr. Carvalis and said that his limitations were not fully supported by the record. And then Dr. Bullard also talks about Dr. Shea's checkbox form, which is just grossly inconsistent with his treatment records. You look at these treatment records, he says at any one time, he actually says he reports five months of between 60 and 100% improvement with his condition with Dr. Shea. And even at the time that he first saw Dr. Sayago, the spinal consultant, back in January 2010, I think it was, hold on, June 2011. At that point, Dr. Sayago specifically said that claimant doesn't describe neurogenic weakness. So you have that, you have these state agency experts who synthesize all of this evidence, and they did fortunately get to see most of it, decided that this claimant is capable of light work, and that's what the ALJ found. Now let me ask you this. We have two treating doctors, Carvalis and Shea, to whom great weight is usually accorded, right? Greater weight than reviewing doctors, right? That's a general presumption. All right, let's go with the general. And then we have the reviewing doctors who poke treating doctors' records by showing inconsistencies, correct? But isn't the ALJ required to do more than just note inconsistencies in weighing the treating doctor's evidence versus the state-retained reviewing doctors under the Treviso case? Doesn't he have to also consider the length of the treating relationship, which in Carvalis's case was years, as it was in Shea's case? The frequency of examination, which was much more frequent, and the nature and extent of the relationship? I don't see any mention by the ALJ that those other factors, besides inconsistency, which Treviso puts out, were really considered by the ALJ. How do you see that? Well, first of all, to the extent Treviso implies that an ALJ has to discuss all of those factors from 1527 in the written decision, that's not consistent with any other case law from this circuit or with the regulations. Having said that — So you say we have an intra-circuit split? I would say — Should we call this case in bank, sua sponte? I wouldn't advise for that. But if you look at — Isn't Treviso the most recent, and therefore the case, if there's doubt, the one we have to follow under Miller v. Gammy? I really think that Treviso — you cannot read it to say that if an ALJ doesn't discuss all six of those factors, it's a remandable error. And I would just point to one of the factors is other. How is a court supposed to say, well, the ALJ didn't talk about other? And I've been doing this job for over 17 years, and I can honestly say I've never seen an ALJ decision that talks about every single one of those factors. So there's that. So we have to read Treviso your way, which means that these factors are optional, not required. I think that the ALJ is supposed to consider them, but the ALJ does not have to articulate each one of them. How do we know they consider them? Do we look in his mind? Well, you can actually — the ALJ did talk about the length of the treating relationships here, and just because that is a factor doesn't mean it weighs in favor of the claimant. Here you have two doctors who, as you mentioned, saw this claimant on multiple occasions, and their records do not support limitations beyond light work, and especially Dr. Shea, who found just these long periods of complete — Because of the epidural injections? Yes. Well, that's treatment — that's another thing that listing 104 requires. Any of the musculoskeletal — Well, we're past 104. Okay. Well, they require you to look at treatment, and this is — treatment here is pretty clearly effective. So going back to the question, though, that was asked, the factors that Treviso outlines from the statute that must be considered, would you acknowledge at least that the ALJ's opinion has to allow us to determine whether the ALJ considered all of the relevant factors? All of the relevant factors? Not every factor is going to be relevant in every single case, and I think here you can understand that from this. If you look at the regulation, it's supportability, which he obviously talked about, examining relationship, treatment relationship, nature and extent of the treatment relationship. You look there, look at how positive Dr. Shea's talked about. Consistency with the record as a whole, the ALJ talks about that. Specialization is the only one that he doesn't necessarily touch on in the decision, and that's — that could go either way. You have Dr. — Does note that Dr. Shea is a pain management specialist. Yes, and he also — I think he says that about Dr. Corvallis, and Dr. Sayago is a spinal surgeon. So the ALJ is thinking about all of these things. You can tell that from the these particular factors always weigh in favor of the claimant. So a long treating relationship actually cuts against the supportability of those opinions here because of what those treatment records say in terms of the claimant's — Because the treatment was successful. Yes. So I'm just about out of time. If you don't have any other questions, we ask that you please affirm the ALJ's decision. Thank you. Thank you very much. Thanks to both counsel. The case of McMahon v. Berryhill is submitted for decision.
judges: Bea, N.R. Smith, Staton